```
 1              IN THE UNITED STATES DISTRICT COURT

 2               FOR THE EASTERN DISTRICT OF TEXAS

 3                       MARSHALL DIVISION

 4
     VIKING TECHNOLOGIES, LLC      )
 5                                 )
     VS.                           )   Case No. 2:20-cv-00357-JRG
 6                                 )   (Lead Case)
     ASSURANT, INC., et al         )
 7
     _____
 8
     ASURION, LLC, et al           )   Case No. 2:20-cv-00358-JRG
 9                                 )
     _____
10
     CLOVER TECHNOLOGIES GROUP,    )   Case no. 2:20-cv-00359-JRG
11   LLC, et al                    )

12

13            MARKMAN HEARING AND STATUS CONFERENCE

14            BEFORE THE HONORABLE RODNEY GILSTRAP

15               UNITED STATES DISTRICT JUDGE

16                       JUNE 15, 2021

17

18   APPEARANCES

19   FOR THE PLAINTIFF:        Mr. Charles Everingham, IV
                               Ward, Smith & Hill, PLLC
20                             1507 Bill Owens Parkway
                               Longview, TX 75604
21                             903.757.6400

22                             Mr. John Francis Petrsoric
                               Mr. Michael S. De Vincenzo
23                             King & Wood Mallesons LLP
                               500 Fifth Avenue, 50th Floor
24                             New York, NY 10110
                               212.319.4755

25
```

```
 1   FOR THE DEFENDANTS:
     (2:20-cv-00357)              Mr. Michael Clayton Deane
 2                                Mr. Matthew W. Howell
                                  Alston & Bird LLP - Atlanta
 3                                1201 West Peachtree Street NW
                                  #4900
 4                                Atlanta, GA 30309-3424
                                  404.881.7777
 5
     FOR THE DEFENDANT
 6   ASURION:                     Ms. Melissa Richards Smith
                                  Gillam & Smith, LLP
 7                                303 South Washington Avenue
                                  Marshall, TX 75670
 8                                903.934.8450

 9                                Mr. Michael Valaik
                                  Ms. Katherine E. Rhoades
10                                Bartlit Beck LLP - Chicago
                                  54 West Hubbard Street, Suite 300
11                                Chicago, IL 60654
                                  312.494.4403
12
     FOR THE DEFENDANTS:
13   (2:20-cv-00359)              Mr. Eric Wolf Pinker
                                  Mr. Patrick Brett Disbennett
14                                Lynn Pinker Cox & Hurst LLP
                                  2100 Ross Avenue, Suite 2700
15                                Dallas, TX 75201
                                  214.981.3837
16

17
     COURT REPORTER:             Ms. Lori Barnett
18                               130 Jaron Drive
                                 Pottsboro, Texas 75076
19                               903.821.3200

20

21
     Proceedings recorded by mechanical stenography, transcript
22
     produced by CAT
23

24

25
```



1          E X H I B I T S

2

3            (None were offered)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              P R O C E E D I N G S
 2          THE COURT:  All right.  This is the time set for
 3     claim construction.  The Court is taking up claim
 4     construction concurrently in three consolidated cases.
 5     These include case number 2:20CV357 styled Viking
 6     Technologies vs. Assurant, Valu Tech, Teleplan and
 7     Broadtech, CWork Solutions, Signal, L.P., Signal GP, and
 8     MMI-CPR, LLC.
 9          It also includes case number 2:20CV358 which is
10     Viking Technologies vs. Asurion, LLC, and case number
11     2:20CV359 styled Viking Technologies vs. Clover
12     Technologies, Clover Wireless, Teleplan Holdings,
13     Teleplan Service, and Reconext LLC.
14          Let me call for announcements on the record.  Let
15     me hear first from the plaintiff, Viking Technologies.
16          MR. EVERINGHAM:  Good morning, Your Honor.  May it
17     please the Court, Chad Everingham for Viking
18     Technologies.  I'm joined today by my co-counsel with the
19     King & Wood Mallesons firm, John Petrsoric and Michael
20     DeVincenzo.  Running the slides for us today, Mr. Dominic
21     Vitatiano is here.  And we're also joined by our client
22     representative, Mr. Kevin Barnett, who's in the gallery,
23     and we're ready to proceed.
24          THE COURT:  All right.  Thank you.
25          Let me hear from the defendants.  We will start
```

1    with the defendants in the 357 case.

2         MR. DEANE:  Good morning, Your Honor.  Michael

3    Deane here, along with my colleague Matt Howell from

4    Alston & Bird representing the Broadtech entities, and

5    the entities in the 357 case.

6         THE COURT:  All right.  Other announcements in the

7    357 case?

8         MR. DEANE:  Your Honor, we represent all of the

9    defendants in the 357 case.

10        THE COURT:  All right.  Then let me hear

11   announcements from the defendants in the 358 case.

12        MS. SMITH:  Good morning, Your Honor.  Melissa

13   Smith in the 358 case on behalf of Asurion.  I am joined

14   by Mr. Michael Valaik.  Mr. Valaik will be addressing the

15   Court this morning -- Mr. Valaik, if can you stand -- and

16   his partner, Ms. Katy Rhoades.  And we're ready to

17   proceed, Your Honor.

18        THE COURT:  All right.  And how about defendant's

19   announcements in the 359 case.

20        MR. PINKER:  Good morning, Your Honor.  Eric

21   Pinker on behalf of the defendants -- all of the

22   defendants in the 359 case.  I'm here with Patrick

23   Disbennett, my colleague.  I'm also here with my client

24   representative, Mr. Rich Fischer, who is sitting in the

25   gallery.

```
 1              THE COURT:  All right.  And Mr. Pinker, just for
 2    my own clarification, does your firm also represent Valu
 3    Tech in the 357 case?
 4              MR. PINKER:  We represent Valu Tech which is a
 5    party in the 359 case, Your Honor.  I'm not appreciating
 6    that there is a Valu Tech entity named in the 357 case.
 7              THE COURT:  All right.  That could be some error
 8    on my part.  I just want to make sure everybody is
 9    covered.
10              MR. PINKER:  Yes, sir.  I represent all of the
11    defendants in the 359 case.  And there has been an
12    amendment to the complaint which substituted, and added,
13    and also removed a party.  There are six named defendants
14    in the 359 case.
15              THE COURT:  All right.  Thank you.
16              MR. PINKER:  Thank you, Your Honor.
17              THE COURT:  All right.  Counsel, let's jump into
18    the disputed claim language for purposes of today's
19    Markman hearing.  Let's begin with biasing the cutting
20    device, and biasing the cutting wire from the 953 and the
21    357 Patents.
22              Let me hear from plaintiffs first.
23              MR. DEVINCENZO:  Good morning, Your Honor.  Mike
24    DeVincenzo on behalf of Viking.
25              THE COURT:  Good morning.
```

1              MR. DEVINCENZO:  The first term is biasing or

2       biasing the cutting device/wire.  The dispute with

3       respect to this term is relatively narrow.  The parties

4       agree that biasing a cutting device or a wire means

5       applying a force to it.  The defendants seek to add an

6       additional requirement that's not in the claims, that

7       when the force is applied it must hold the wire or

8       cutting device in a given position.  The defendants

9       additional language is inconsistent with the claims

10      itself and the specification and it's not supported by

11      the prosecution history.

12              With respect to the claims -- and since this is

13      the first term, I'm going to put up Claim 1 and go

14      through it a little bit because the claim in this case is

15      pretty clear and readily understandable, especially with

16      reference to Figure 7.  The claim's about a method of

17      removing a protective glass top surface from a display

18      unit.  There are three layers in the display unit.  It

19      has a glass top, it has -- that's the top layer in the

20      figure.  It has an electronic display portion, that's the

21      bottom layer, 22.  And then there between is an

22      intermediate layer.  And in Figure 7 that's depicted as

23      24.

24              So what the claim says is, in order to remove that

25      glass top surface, the first thing you do is you fix the

 1    device in a carriage.  The second thing you do is you
 2    align a cutting device in a coplanar relationship with
 3    the intermediate layer.  Then you bias the cutting device
 4    in the intermediate layer adjacent to the electronic
 5    display portion and away from the glass.
 6          And then later -- and this is the last element --
 7    so now you have the device in the carriage, you have the
 8    wire aligned with that inner layer, and then you drive
 9    the wire or the cutting device into that middle layer.
10          THE COURT:  I understand, Counsel, visually to me
11    is like the cheese board with the wire cutting the pieces
12    of cheese.
13          MR. DEVINCENZO:  Yes, to some extent.
14          And Claim 8, dependent claim, it expressly
15    requires advancing during the biasing -- so in your
16    example you would be moving the cheese relative to the
17    wire or the wire relative to the cheese as you're
18    biasing.
19          Now Figure 7, the Z is not actually in the figure
20    but the defendants have that in their brief and it's in
21    the prosecution history.  And the reason Z is important
22    is because that's the way you're biasing.  You're pushing
23    down.  And the reason you're pushing down is not to hold
24    the wire in place, it's so glass shards don't get caught
25    in the intermediate layer.  And that's explained in the

1    specification.

2         So based on the claim itself, especially Claim 8,

3    we know that biasing does not require holding the wire in

4    a given position.  It's just directly inconsistent with

5    the claim language.  The defendants admit as much.  They

6    agreed -- and this is from page 12 of their brief -- that

7    the asserted claims require the cutting device to move,

8    yet they never grapple with the fact that if the cutting

9    device is required to move during biasing, which is what

10   they admit, how can the construction of biasing require

11   to hold the cutting device in a given position.  It's

12   clearly changing positions.

13        Now the claims are not surprisingly consistent

14   with the specification.  Specification teaches movement

15   during biasing.  In their responsive brief -- and on the

16   slide I have 632 through 36 but there are several

17   examples in the parties' briefing.  Most important, the

18   defendants themselves, they admit this.  They admit

19   there's movement during biasing according to the

20   specification.  They explain the specification describes

21   applying force to the cutting device which holds the

22   cutting device adjacent to the electronic display as it

23   moves.

24        And now earlier I talked about the purpose of

25   biasing.  And defendants have said, well, the purpose --

1    and this is in their briefing but it's not reflected in

2    their construction -- is to hold the constant in the Z

3    position.  So although you would be applying a force down

4    which would suggest that it could move downwards in the Z

5    position, in the briefing the defendants said well,

6    movement is allowed and they conceded that.  But they

7    said, but no movement is possible in the Z position and

8    they argued that's the purpose of biasing, to keep it

9    steady.  We think that's inconsistent with applying a

10   force downward.  By applying a force downward, generally

11   something would move down.  That's why you're applying a

12   force.

13        But more importantly it's inconsistent with the

14   specification.  The specification teaches the purpose of

15   biasing is not to hold it in a constant Z position, it's

16   to keep it as far away from the glass layer as possible,

17   to prevent encountering snagging of the glass layer.  So

18   as you hold it down it can go around shards of glass.  So

19   if you're pushing it in the middle of the intermediate

20   layer and there's shards of glass, you apply a force

21   downward as you're moving forward and it will go around

22   that.  And on the slide is Column 6, lines 10 through 22.

23   But this purpose of biasing is also discussed in Column

24   3, lines 50 through 55.  And there it says, also

25   disclosed is a method further including the step of

1    biasing the wire away from the glass to prevent

2    encountering snagging of the glass layer -- oh, I'm

3    sorry, to minimize encounters with broken glass.  So

4    that's the point of biasing.  It's not to hold it in a

5    given position.

6         Now defendants argue otherwise based on one

7    portion of the specification and they rely on Column 3,

8    55 to 60.  And there a particular embodiment of biasing

9    is disclosed.  And it says a method wherein the biasing

10   steps includes locating wire guide posts in a plane below

11   that of the electronic display portion so that the wire

12   is biased against that portion as it enters and exits the

13   intermediate layer.  And in their briefing defendants

14   argued, well, this means there can be no movement in the

15   Z direction because as the wire enters and exits the

16   intermediate layer it's always going to be against a

17   specific plane of the electronic display portion.  Well,

18   that's only in the embodiment with wire guide posts.

19   That's what support here, and wire guide posts would keep

20   the wire in one position with respect to the Z direction.

21   But the claims at issue don't require wire guide posts,

22   and biasing itself without wire guide posts is nowhere

23   described in the specification as requiring no movement

24   in the Z direction.

25         Turning to the prosecution history.  The

1        prosecution history never distinguished prior art based

2        on the use of biasing such that no movement could be

3        required or no movement in the Z direction would be

4        required.  Instead, as stated on page 16 of Applicant's

5        appeal brief from the Examiner's rejection, they said --

6        and this is with respect to one of the prior art

7        reference -- there's no disclosure of biasing as required

8        by the claims, namely, away from the glass.  It was the

9        direction of biasing that was distinguished, not whether

10       anything had to be held in place.

11              And in that brief, on this page on the slide,

12       Tajima's references discuss -- when each of the

13       references discuss the appeal brief, it's always

14       distinguished for the same reason, the direction of

15       biasing.  It's not about holding a wire in a given

16       position.

17              So where does the defendant's construction

18       actually come from.  Well, there were dictionary

19       definitions discussed in the appeal.  And the Applicants

20       told the Examiner, those of ordinary skill in the art

21       would readily understand the term biasing requires the

22       application of some force in this mechanical engineering

23       art, and then there's a colon there.  And this is on page

24       16 of the Applicant's brief.  And there are four

25       dictionaries listed.  I think in our brief we

1    inadvertently said five, but there's four.  And I'll go

2    through them on the next slide.

3          And then later after identifying all four

4    dictionary definitions, the Applicants explain, "thus,

5    those of ordinary skill in the arts would fully

6    understand that the term bias and its related words

7    includes the application of some force."  And the reason

8    that was in issue is explained in the very next sentence.

9    The Office action, which was being appealed, had stated

10   that a biasing force which is not currently claimed.  So

11   in the Office action rejection, the Examiner had

12   reflected this belief that biasing does not require

13   application of force.  So in the appeal brief they said

14   yes, it requires an application of force, and it requires

15   a particular application of force away from the glass

16   because that's how you get around those shards of glass

17   as you're trying to pop the glass cover.

18         THE COURT:  Is it a constant level of biasing

19   force or does the level of biasing force vary through the

20   removal process?

21         MR. DEVINCENZO:  It doesn't -- it's -- you have to

22   bias at least once.  You don't have to bias the whole

23   time.  So as you're sliding through, you encounter a

24   piece of glass, you can bias around it.  But you don't

25   have to bias the whole time.  That's not required by the

1       claims and that's not required by defendant's
2       construction either.
3                THE COURT:  All right.  What else?
4                MR. DEVINCENZO:  And then on the Board's decision,
5       I have the appeal reply brief.  They said, Patent
6       Examiner's use of the term force as a possible synonym is
7       not inconsistent with the use of the word in this
8       application.  They said, as a possible synonym is not
9       inconsistent with the use of the word in this
10      application, but that's Viking's construction.  That has
11      nothing to do with holding it in place, that's saying a
12      force is a synonym for bias.  And that's how the Board
13      understood it.  In the Board's decision, the Applicant
14      agrees that the term force is a possible synonym for bias
15      is not inconsistent with the use of the word in this
16      application.
17               And then later, "given the general agreement
18      between the Examiner and the Appellant that bias refers
19      to force, the Examiner's stated definition does not
20      appear to be a source of material dispute."  So they are
21      saying biasing means force.
22               And now I'm going to turn to the dictionaries.
23      And before I said there were four dictionaries.  And when
24      the Applicants were explaining to the PTAB that biasing
25      means application of force, they referred to all four

1      dictionaries.  And all four dictionaries indicate that
2      biasing would refer to a force.  You have Dictionary of
3      Engineering, "the force applied."  The Free Dictionary,
4      "to influence in a particular direction."  The Oxford
5      Dictionary, "show inclination against something."  The
6      Merriam-Webster Dictionary, "apply a slight negative or
7      positive voltage."  And a voltage is a force.  So the
8      Examiner said -- I mean the Applicant said all of these
9      dictionaries are consistent with our construction.
10              So what do the defendants do?  They take the first
11     dictionary and they say if we cut it off there and
12     pretend that's the only dictionary and we say a force
13     applied to a relay to hold it in a given position, and
14     that's what they use.  And then in their briefing they
15     put in extrinsic evidence and they say the McGraw-Hill
16     dictionary similarly says bias in the electrical arts
17     could refer to the force applied to a relay to hold it in
18     a given position.  And we all agree that electrical arts
19     if you're applying it to a relay -- which is not what the
20     invention is about -- it could be to hold it in a given
21     position.  But we know that's not the definition here.
22     We're not talking about relays.  We're not talking about
23     the electrical arts.  We're talking about the mechanical
24     arts.  And we're talking about moving the wire as you're
25     pushing it through the intermediate layer.  These

1    dictionaries are simply inapplicable and they can't be

2    used to contradict the intrinsic evidence.

3         One more.  And then lastly, the defendants rely on

4    two extrinsic patent applications and they say, well,

5    these define bias as requiring no movement in a

6    particular direction.  Neither of these applications

7    actually define the word biasing at all.  They simply use

8    it in a manner -- let me slow down.  With respect to the

9    first one, neither of them define what it means to bias.

10   Instead they use the term bias, and they say the biasing

11   force in that application will retain objects, will not

12   allow movement in a particular direction.

13        Well, in those applications that's what's

14   explained.  That's not the definition used here.  And

15   that can't be used to contradict the intrinsic evidence.

16   If the force is being applied down as a matter of logic

17   and reason, the wire may move down.  That's how the force

18   works.  If you're applying a force downward it may move

19   down.  And there's nothing in the intrinsic evidence that

20   says otherwise.

21        THE COURT:  All right.  What else?

22        MR. DEVINCENZO:  That's all.

23        THE COURT:  Let me hear from the defendants in

24   response.

25

17

1       MR. VALAIK:  Your Honor, Mike Valaik.

2          Biasing here was really the crux of the purported

3       invention.  We see that throughout the prosecution

4       history, and more importantly in the claim language.

5       When we actually look at Claim 1 -- and I'll show it here

6       in a minute of the 537 Patent, it's clear that biasing

7       the cutting  device or wire is really at the heart of

8       this because the rest of it as plaintiff's counsel

9       detailed, you align the cutting device, you drive a

10      cutting device, you advance a cutting device.  That

11      really didn't go to the heart of this invention.  Indeed,

12      that cutting with a wire was around in both industrial

13      applications and other settings as Your Honor alluded to,

14      such as a cheese wire.

15         Before showing why we believe, Your Honor, to hold

16      it -- the cutting device wire -- in a given position is

17      the appropriate construction, I just want to make two

18      preliminary points.  First, it is not our position that

19      during biasing the cutting wire is stationary.  We said

20      as such in our briefing, and Viking maintains that to

21      hold it in a given position means the wire is not moving.

22      And it's interesting, we'll walk through the prosecution

23      history and we'll see that defendant's construction here

24      is; one, what plaintiff offered and really what held

25      throughout prosecution.  And no one got confused that

1    when you use the construction, applying a force to the
2    cutting device/wire in a given position, means biasing
3    stationary wire can't move.  And so here Viking is just
4    simply mischaracterizing our position.
5         And the second preliminary point before I walk
6    through the claim specification prosecution history is
7    simply if we apply plaintiff's construction, simply
8    applying the force, we believe you're leaving out the
9    biasing limitation.  Because to move a wire you apply a
10   force, to drive the wire, to cut the wire you have to be
11   applying a force.  And so leaving that alone, we're going
12   to take the biasing limitation and in some sense we're
13   conflating it with the rest of the claim.
14        So why is defendant's construction to add "hold it
15   in a given position" correct.  First, looking at Claim 1
16   we see the entire limitation, biasing the cutting device
17   in the intermediate layer adjacent the electronic display
18   portion and away from the glass.  And that's important
19   because immediately we see how biasing is used in the
20   asserted claims, it's positional.  You are biasing the
21   device, applying that force so you can stay adjacent the
22   electronic display so you can maintain that position away
23   from the glass.
24        When we turn to the specification, similarly --
25   and this is in the 537 Patent, Column 6, lines 10 through

1       21.  We see here first the preferred method -- it's

2       important, I just want to stop for a minute.  This is the

3       preferred method of separating the electronic display,

4       not the preferred method of biasing.  Because the patent

5       in the specification discloses a number of different

6       methods for separating the electronic display.  But for

7       purposes of why to hold it in a given position is the

8       construction here, Your Honor, we see it talks about

9       biasing the wire blade, maintaining the cutting element

10      in a coplanar relationship, and so again positional.  You

11      are applying this force so you can hold it in a given

12      position.  It goes on to say keeping it taut and aligning

13      it carefully to maintain the coplanar relationship.

14           And then finally as we've discussed, this is to

15      keep it as far away from the glass as possible to prevent

16      encountering or snagging of the glass layer.

17           THE COURT:  Let me ask you this, Counsel.  If

18      requiring a force means movement how does that not

19      contradict with your hold it in a position?

20           MR. VALAIK:  If we take hold it in a given

21      position as being stationary, it does contradict it

22      because application of a force doesn't necessarily mean

23      you have to move.  You can apply a force and that -- it's

24      not enough force to where that object is physically

25      moving.  But if we take it the next step, that

1    application of a force is going to move that wire then if
2    "hold it in a given position" means stationary, then that
3    is contradictory.  That is confusing.  We believe when
4    you read "hold it in a given position" in the context of
5    Claim 1, as well as the specification, it's quite clear
6    that during the biasing step that you're moving.  We
7    agree with plaintiffs on that point and we don't mean to
8    suggest in our construction with hold it in a given
9    position it's going nowhere.
10            THE COURT:  Does your view of hold it in a given
11    position preclude the ability of the wire to move in
12    what's called the Z direction during its travel through
13    the intermediate layer?
14            MR. VALAIK:  No, Your Honor.
15            THE COURT:  So you can't drop down to dodge the
16    shard glass.
17            MR. VALAIK:  You can.  I was going to cover this,
18    but I'll cover it now in light of your question, sir.
19            We said on page nine of our brief, the parties
20    further agree -- this is our second sentence in the
21    biasing discussion.  "The parties further agree the claim
22    biasing step requires that the forces apply to the
23    cutting device in the direction along the Z axis as shown
24    in annotated version of Figure 7 above, that Applicant
25    submitted to the Board during prosecution."

1          So we agreed there with plaintiff as well that

2    biasing requires this application of force in the Z axis

3    direction.  And as counsel said, that could create

4    movement in the Z axis direction.  That's fine with us

5    and it's just another example where we -- they are

6    mischaracterizing our position.  We did say there would

7    be no movement.

8          THE COURT:  Well, if there can be movement and if

9    there can be movement in the Z position or Z direction,

10   where is the merit of the value of adding, to hold it in

11   a given position?  Why is that necessary?  Why is it

12   informative?  Why does it help the jury instead of

13   confuse the jury?

14         MR. VALAIK:  Because what we'll see both in the

15   claim language, the specification, and walking through

16   the prosecution history is that the whole purpose of

17   biasing here is positional.  The whole purpose, the

18   inventive concept that they say they claim is that if you

19   encounter a glass shard, what you need to do in this

20   application of force as you're maintaining it adjacent to

21   the electronic display or otherwise, you're going to move

22   that.  You're going to apply a force now in the Z axis.

23   You're going to go just down and around, simply let's go

24   around an obstacle.  And so what helps the jury here is

25   to understand that with respect to biasing, not simply

1    driving, cutting, application of force, that this is the

2    critical step that they claim is inventive.  And what

3    it's doing is maintaining or keeping that wire in a

4    certain position.  And if -- if it connotes to the

5    average person that means stationary, we can offer an

6    alternative construction that clears that up.  But we

7    believe it's critical here, it's not simply pulling a

8    wire and applying a force.  That standing alone is, you

9    know, the same thing as driving, or cutting, or any of

10   those things.  Biasing has to mean more, and it has to be

11   applying that force to the wire for that positional

12   purpose.

13        THE COURT:  Define what you mean by "positional

14   purpose"?

15        MR. VALAIK:  Well, I'll go back right here.

16   Positional purpose, Your Honor, looking at the spec here,

17   would be you bias the wire or blade against, adjacent, or

18   close to the plane adjacent the electronic display.

19   Defense says, maintaining cutting element in a coplanar

20   relationship.  And we're going to talk about coplanar

21   relationship today.

22        THE COURT:  I assume we will.

23        MR. VALAIK:  And so you want to keep that

24   position.  And then keeping it taut, aligning it

25   carefully to maintain that coplanar relationship.  So

1     we're not simply applying a force, we're doing more.

2     We're applying a force so that we hold that wire in a

3     given position or maintaining a certain position.

4          THE COURT:  Let me ask you this.  Is the biasing

5     direction called out and specified in the claim language?

6     And if so, how and where?

7          MR. VALAIK:  The specific direction is not called

8     out, Your Honor.

9          THE COURT:  Okay.  All right.  Let me hear the

10    rest of your argument.

11         MR. VALAIK:  Yes, sir.

12         I've turned now to the prosecution history.  And

13    plaintiff's counsel showed the definitions but I think

14    it's important to stop at the first definition and show

15    when they included the definition of bias here, the force

16    applied to a relay to hold it in a given position.  One

17    is what plaintiffs offered.  And I think two, it's

18    important to mention they said right here, those of

19    ordinary skill in the art readily understand that the

20    term biasing requires the application of some force.  And

21    here, what is that art?  It's the mechanical engineering

22    art.  And the one definition that plaintiffs offered from

23    a mechanical engineering source is indeed what we offer

24    as our construction here today, which includes, to hold

25    it in a given position.

1          THE COURT:  Let me interrupt.  Let me go back to
2     my prior question.  When you said that the biasing
3     direction is not called out in the claim, tell me how
4     that argument squares with the language in Claim 1,
5     biasing the cutting device in the intermediate layer
6     adjacent to the electronic display portion and away from
7     the glass.  Doesn't "away from the glass" denote a
8     direction?
9          MR. VALAIK:  Away from -- if you're going to be
10    biasing the cutting device in the intermediate layer and
11    you're adjacent the electronic display portion, we
12    believe biasing there is simply, you're adjacent that
13    electronic display.  Away from the glass is consistent
14    with the rest of the specification and the claim, you're
15    just simply as far away from the glass as you can be.  It
16    is -- it does not say explicitly that biasing force is in
17    the Z axis direction.
18          And one important point here in the specification
19    also includes you can -- this can be in both directions,
20    too.  And so, you know, once it's adjacent the electronic
21    display, simply saying "away from the glass" there is
22    you're as far away from that glass as you can possibly
23    be.  We don't believe that explicitly says in the Z axis
24    direction.  And Figure 7 here is quite important.
25    Because in Figure 7 of the patent, we just have our X and

1    Y direction.  And what they included in prosecution of

2    Figure 7, they included in that Z axis direction to make

3    clear to the Examiner who also didn't understand biasing

4    in the context of these claims, that in fact we're

5    talking about application of a force in a Z axis

6    direction.  That wasn't clear based on the claim language

7    alone to the Examiner.

8              THE COURT:  All right.  Let's continue.

9              MR. VALAIK:  Yes, Your Honor.

10             And so I have on the top of the screen here on our

11   Slide 6, this was the definition for biasing in the

12   mechanical engineering art that plaintiff offered.  And

13   it's important -- I mean this is what the Examiner

14   adopted for purposes of the prosecution.  He then

15   applies, you'll see at the bottom, the very definition

16   that plaintiffs offer here in the mechanical engineering

17   art.  With respect to these other definitions that

18   plaintiff's counsel discussed, he said looking at these

19   three others, they are simply our every day understanding

20   of biasing to influence in a particular, typically unfair

21   direction.  Also, you know, pause to feel or show

22   inclination of prejudice.  And similarly with respect to

23   the Miriam Webster, to give a settled and often

24   prejudiced outlook.  I mean those are every day

25   understandings of biasing.  And plaintiff is correct,

1    they did advocate the application of force in the

2    prosecution but they also had, to hold it in a given

3    position, and that's what the Examiner adopted.

4         And the last slide I have here, Your Honor, is the

5    actual decision on appeal.  It's clear the Examiner also

6    states that the definition in the online Dictionary of

7    Engineering is the force applied to a relay to hold it in

8    a given position.  And Viking didn't object to the

9    application of that definition in prosecution either.

10        And so just to conclude, Your Honor, I put Claim 1

11   back on the screen.  We believe first when you read the

12   biasing limitation in context of the entire claim it's

13   clear that you're moving when biasing, and we agree with

14   plaintiffs in that respect.  But then secondly and more

15   importantly, biasing is positional.  It is the

16   application of force for a reason, to hold that wire in a

17   certain given position.  You can change the force in the

18   Z axis direction to go ahead and get around glass.  But

19   simply to say, to apply force, is too broad a

20   construction for this term and it's going to conflate

21   with driving, advancing, and some of these other terms in

22   Claim 1.

23        THE COURT:  All right.  Thank you, Counsel.

24        Let's move on to the next disputed term,

25   intermediate layer.  Plaintiff tells me there's no

1    construction necessary and defendant gives me a lengthy
2    construction.
3         Let me start with the defendant in this case and
4    let me hear their explanation of why the proposed
5    construction is appropriate.
6         MR. DEANE:  Good morning, Your Honor.  Michael
7    Deane here.
8         THE COURT:  Good morning, Mr. Deane.  Go ahead
9    when you're ready.
10        MR. DEANE:  So the intermediate layer term as we
11   just discussed is present in multiple places in the
12   claim, including in the biasing step.  And what I think
13   the dispute here is, Your Honor, is that the defendants
14   believe that the intermediate layer is everything between
15   the glass and the electronic display, and our
16   construction of that term attempts to capture that
17   concept whereas the plaintiff's construction leaves that
18   issue open.  And the defendant's construction tracks the
19   specification.  And we would be perfectly happy, Your
20   Honor, if you adopted the language right out of the
21   specification here as well.
22        THE COURT:  Are you talking about Column 5, lines
23   50 to 56?
24        MR. DEANE:  Yes, Your Honor.  Where it says that
25   the intermediate layer is bounded by upper and lower

1    interface planes which are adjacent the electronic

2    portion in the glass layer.  We think that that's

3    defining the boundary of the intermediate layer, the

4    glass layer and the electronic display layer.  And we

5    think the second part that says the distance between

6    those planes is the thickness of the layer.  And so we

7    believe that that means everything in between.

8          And so as you can see from the picture at the

9    bottom of the screen, there may be multiple components

10   inside of an intermediate layer.  So there may be a layer

11   of adhesive, a polarizer, and another layer of adhesive.

12   And so we believe that our construction tracks how the

13   specification describes the intermediate layer where it's

14   described as a sandwich structure with the buns being the

15   glass and the electronic display and everything in

16   between being the intermediate layer.

17         And I think it's important to point out, Your

18   Honor, we're not arguing that this requires a specific

19   orientation.  The next line in the specification that I

20   believe the plaintiffs cite in their brief is, you know,

21   we believe perfectly valid.  Upper and lower are terms

22   that can be interchanged.  But, you know, from our

23   perspective we're not up here to argue that the glass

24   always has to be the upper layer and the electronic

25   display always has to be the lower layer.  What we're

1          trying to capture is that everything between is the
2          intermediate layer.  And we think that the reason that
3          this is important, Your Honor, is because again, the
4          intermediate layer is where the biasing takes place.  And
5          it's important to define where that location is.  And we
6          think that the potential problem is, is that the
7          plaintiff may try to argue that the intermediate layer is
8          only a portion of that layer in between.  Because it is
9          possible to insert a wire in, for example, the upper part
10         of the intermediate layer or the upper adhesive above the
11         polarizer.  And if you're doing that you're not -- if
12         you're doing that, you're inserting it into an
13         intermediate layer.  And we think that they are going to
14         then read the rest of the claim to say that they are then
15         biasing against the polarizer.  And since the polarizer
16         is in the plane that's most adjacent to the electronic
17         display, that that somehow meets their claim language.
18         And we think that that's improper and we think that that
19         doesn't actually -- that is inconsistent with how the
20         specification describes the intermediate layer as a
21         whole.
22                And I'm not sure, I think we're actually not that
23         far apart on this claim term.  But the issue is that the
24         plaintiff's brief doesn't quite get there.  They say that
25         the claims define the intermediate layer and they say the

1    claims define the intermediate layer as a portion of the

2    display unit between the glass top and the display

3    portion.  But what they are pointing to is the preamble.

4    And nobody is arguing that the preamble is limiting.  And

5    so what the defendants are trying to do is clarify the

6    construction of intermediate layer by using how the

7    specification describes it and defines it instead of as

8    the preamble, which nobody argues is limiting.

9         So, you know, I guess if the plaintiff wants to

10   come up and say that they think that the intermediate

11   layer is everything in between the glass and the

12   electronic display portion then we would be in agreement.

13   But as it stands right now, we believe that plaintiff's

14   nonconstruction leaves the issue unaddressed.

15        THE COURT:  And is that because of the polarizer

16   as well as the adhesive?  Is there an open door here to

17   something else being in that gap between the glass and

18   the electronic display or is that just an unknown at this

19   portion?

20        MR. DEANE:  We believe it's unknown in the sense

21   that plaintiffs' construction leaves it unaddressed.  And

22   there are various different products that are being

23   accused of infringement, each which have different

24   components in between.  And so our attempt is to make

25   sure that the plaintiff doesn't come in and argue there

1    are, for example, multiple intermediate layers where some

2    portion of the intermediate layer consists of one

3    intermediate layer and if the biasing takes place in that

4    intermediate layer then it meets their claim element.  We

5    believe that the intermediate layer must consist of

6    everything in between the glass and the electronic

7    display.

8         THE COURT:  And your primary support for that is

9    the portion of the specification we talked about in

10   Column 5?

11        MR. DEANE:  Yes, Your Honor.  We believe that this

12   portion of the specification tracks the defendant's

13   definition.  But again, to the extent that this is more

14   clear, we're happy to adopt this language as well.  Our

15   goal was to capture the concept.

16        THE COURT:  Let's look at the drawing you've got

17   on the screen with the glass, for lack of a better term,

18   on the top here, and the electronic display on the

19   bottom, then you've got the adhesive with the polarizer

20   shown with adhesive on either side of the polarizer.  As

21   a practical matter, does this wire dodge the polarizer in

22   the middle of this intermediate layer and does it slice

23   through the adhesive either between the glass and the

24   polarizer or between the polarizer and the electronic

25   display?  Is the polarizer of a consistency that's equal

```
 1          to the adhesive and it doesn't matter?  I mean it almost
 2          looks like the polarizer could be an impediment to use of
 3          the wire between the glass and the electronic display to
 4          remove the glass and still allow for the kind of Z
 5          directional movement that we talked about earlier in
 6          dodging shards of glass, et cetera.
 7                  Do we have some accused products that are -- or
 8          potentially accused products that have something besides
 9          a polarizer or are there two different polarizers with
10          adhesive between -- I mean do we have a, you know,
11          wedding cake situation with layer, layer, layer, layer in
12          this intermediate area?  Tell me what your view of those
13          questions is.
14                  MR. DEANE:  So, Your Honor, I guess the best way
15          to describe it is I think -- I think you're correct and
16          you're on to what we're also on to here, is that the
17          different products have different components in there,
18          and we think that the intermediate layer is the way it's
19          described by the patent, consists of all of those
20          components.  And so there is in some instances going to
21          be a wedding cake situation in the sense where there's
22          going to be one polarizer and two different adhesives in
23          some products, but we're more concerned with the method
24          of removal because we -- there's a lot of ways to remove
25          a protective glass cover from a cell phone.  And they
```

1    have -- the way that they've accused it and the way that

2    they've accused this specific biasing step is to do it in

3    a plane adjacent to the electronic display.  And so we

4    don't believe that if you have a method where you're

5    not -- where you're removing the glass cover but not

6    removing the polarizer and you have to go back later and

7    remove the polarizer, you're going to be able to achieve

8    that biasing step as they've claimed it.  And so we think

9    that of the various different methods that you could

10   potentially remove glass from a cell phone screen that

11   they've claimed one of these methods.  And so we believe

12   at minimum to achieve their biasing step they are going

13   to have to bias adjacent the electronic display, you

14   know, in reference to that figure.

15          THE COURT:  Are you aware of any products where

16   the wire makes more than one pass between the glass and

17   the electronic display?  Again, go back to your art work

18   here on the screen.  Perhaps the wire runs between the

19   glass and the polarizer and then comes back and on the

20   second pass runs betweens the polarizer and the

21   electronic display.

22          MR. DEANE:  Yes, Your Honor.

23          THE COURT:  I would think some polarizers are

24   probably of a material that would impede the movement of

25   the wire, and as a practical matter the density of the

1    polarizer would be considerably different than the

2    density of the adhesive.  And as a practical matter,

3    people in the art would be trying to say in the adhesive

4    as they remove this, whether it's all done in one pass

5    between the electronic display and the polarizer or

6    whether it's done in two passes where you remove the

7    glass but leave the polarizer and then come back and have

8    to do a second pass to remove the polarizer.

9         MR. DEANE:  That's correct, Your Honor.  We're

10   aware of the -- of the method that you just described,

11   which was the two pass method where you remove the glass,

12   and then once the glass top is removed you then come back

13   later and you remove the polarizer.  The polarizer is

14   very thin, but at the same time there are machines out

15   there that are -- that do two passes on the device.

16        THE COURT:  All right.

17        What else do you have for me on this, Mr. Deane?

18        MR. DEANE:  That's it, Your Honor.

19        THE COURT:  Let me hear from the plaintiff in

20   response.

21        MR. PETRSORIC:  Good morning, Your Honor, John

22   Petrsoric from King & Wood Mallesons for the plaintiff,

23   Viking Technologies.

24        I think this dispute largely comes down to whether

25   the claim, including the preamble, defines the term

1    versus whether there's a lexicographical definition in

2    the specification.  Clearly as we've been going through

3    the biasing step, the issue of the spacial construction

4    with the intermediate layer being sandwiched in between

5    the glass top and the electronic display portion, is

6    critical to the way the claims operate because the

7    biasing step tells us that the cutting device or wire has

8    to go away from the glass and adjacent the electronic

9    display.  That would clearly suggest that indeed as the

10   preamble suggests -- and the specification does suggest

11   as well that the intermediate layer is immediately

12   sandwiched in between the glass top and the electronic

13   display.

14           Mr. Deane just mentioned that the defendants would

15   be okay with the lexicographical definition from the

16   specification but that is not a clear -- there was no

17   clear intent in the specification to initiate or to

18   select that as a definition.  And we do believe the

19   preamble is limiting.  It's not a discussion we've had

20   with the defendants and I don't think anybody has

21   specifically proposed it, but if the preamble is not

22   limiting, the claim is -- sort of loses a bit of sense

23   because how could you then go away from the glass and

24   adjacent the electronic display if the intermediate layer

25   isn't sandwiched in between the glass top and the

1    electronic display.

2         And again, if you go back to the preamble of all

3    the asserted claims the preambles clearly define that the

4    display unit has a glass top, electronic display portion,

5    and the intermediate layer there between.  So the

6    intermediate layer in all these instances and in the

7    infringement as well, is going to be in between the glass

8    top and the electronic display portion and that's

9    consistent with the -- what we're showing in Figure 7,

10   even as annotated by the Applicants during the

11   prosecution.

12        The specification clearly states that the cell

13   phones generally use the sandwich structure.  This is not

14   a definitional statement.  Neither is the next set of

15   statements that defendants rely on for their assertion of

16   lexicography.

17        THE COURT:  Let me stop you there.  Let's look at

18   that highlighted language.  And it begins with,

19   "regardless of the nature of the intermediate layer."

20   Doesn't that pretty much say this covers everything?  I

21   mean that's a pretty broad introductory phrase there,

22   "regardless of the nature of the intermediate layer."

23        That doesn't raise any indication to you that that

24   may be lexicographical?

25        MR. PETRSORIC:  I don't believe it does.  It does

1           not say this specific invention.  And I do believe the

2           claims are drafted to specifically address the

3           definitional aspect of it.

4                   THE COURT:  All right.

5                   MR. PETRSORIC:  So I think the next -- we clearly

6           agree that regardless of whether something is in an upper

7           or lower position based on whether the glass is face down

8           while the method is being performed or whether the glass

9           is face up while the method is being performed, we're in

10          clear agreement that the intermediate layer is bounded by

11          the electronic display portion and the glass.  It comes

12          right out of the claims, nobody is disputing that.

13                  THE COURT:  Well, if we're all in agreement that

14          that's the case that whatever is between the bottom of

15          the glass and the top of the electronic display is the

16          intermediate layer, where is the fight?

17                  MR. PETRSORIC:  That's what I -- I think the fight

18          may well have been whether the preamble is limiting.  And

19          I think plaintiff concedes that the preamble is indeed

20          limiting in that the intermediate layer is defined by the

21          sandwich of the glass on one side and the electronic

22          display portion on the other.

23                  THE COURT:  Well, maybe I'm -- maybe I'm missing

24          something here but if both sides are telling me the

25          intermediate layer is what lies between the glass and the

1    electronic display, why shouldn't I just adopt that as

2    the construction rather than leave, as you've suggested

3    in your briefing, no construction is necessary and leave

4    the door open to some creative trial lawyer in front of a

5    jury deciding to tell them that it's something different

6    or there's some other reality here than the intermediate

7    layer is between the glass and the electronic display.

8         MR. PETRSORIC:  We believe that that's what is

9    expressly stated in the preamble.  And if the preamble is

10   limiting we wouldn't believe that there would be any

11   further construction necessary beyond that.  That it's

12   already -- that definition is already expressed in the

13   claim itself.

14        THE COURT:  So it's not about what the definition

15   is, it's about whether it should be expressly stated by

16   the Court or should be simply left as it exists through

17   the limiting preamble?

18        MR. PETRSORIC:  Yes.  Exactly.

19        THE COURT:  So that's what we're fighting over?

20   How to say the same thing we all agree on?

21        MR. PETRSORIC:  It would appear that way, yes,

22   without adding -- without the exercise of adding excess

23   words like upper and lower that only would be a potential

24   source of confusion.

25        THE COURT:  Okay.  All right.  Well then what else

1    do you have for me?

2         MR. PETRSORIC:  Again, just a quick recap.

3         The claims specify that the intermediate layer is

4    the layer between the glass top and the electronic

5    display portion and it's fairly self evident given we're

6    in the three-dimensional world here that the intermediate

7    layer, like the glass top and the display portion itself,

8    are going to have a length, a width, a thickness, and

9    it's the -- there's beyond the limitation that's set

10   forth in the preamble, there is not a necessity for the

11   Court to do anything further in terms of construction.

12        THE COURT:  All right.  I think I now understand

13   your position better.  Thank you, Counsel.

14        MR. PETRSORIC:  Thank you.

15        THE COURT:  Okay.  Let's go on to, in the

16   intermediate layer.  Again, the plaintiff is proposing no

17   construction is necessary, the defendant proposes after

18   the cutting device/wire enters the intermediate layer.

19        Let me hear from the plaintiff first on this.

20   I'll save you a few steps.

21        MR. PETRSORIC:  Thank you, Your Honor.

22        I think the main dispute in the parties'

23   construction here is whether this boils down to a spacial

24   limitation or whether this could be a temporal

25   limitation.  Starting with the claims themselves, we

1    are -- biasing is performed, we know, as an expressed

2    requirement in the claims, in the intermediate layer

3    adjacent the electronic display portion and away from the

4    glass.  So we know that biasing, we're applying some

5    force and the parties agree on there is an application of

6    some force on the cutting device or the cutting wire in

7    the intermediate layer to move it away from the glass and

8    adjacent the electronic display portion.

9         So if we look at Figure 7 again, in thinking of

10   this is a cross-section with the cutting wire, for

11   example, while it's in the intermediate layer, the glass

12   is on top and the electronic display portion is below.

13   Biasing is -- applies a force to bring the wire towards

14   the electronic display and away from the glass.  Again,

15   this is the expressed language of the claim.  And the

16   expressed language of the claim is that this has to

17   happen in the intermediate layer.

18        This was re-enforced in the prosecution history.

19   For example, the Examiner had stated early on that the

20   method claims did not limit a bias being induced to the

21   cutting device until it had entered the intermediate

22   layer.  And the Applicants noted in retort that that's

23   what -- the expressed language of the claims is such that

24   the biasing must occur in the intermediate layer.  Now

25   undoubtedly and from a practical perspective the

1     Applicants noted that, well, of course if it's going to

2     happen in the intermediate layer the cutting wire would

3     have already had to enter the intermediate layer.  The

4     claims make no sense otherwise.  But that's also not a

5     reason to redraft the claims.

6          And of course from based on the Applicant's

7     argument that the claim specifically require that the

8     biasing literally occur in the intermediate layer, the

9     Examiner was overruled by the PTAB and the claims were

10    allowed.  We believe no construction is necessary because

11    as the defendants say, this is an otherwise clear claim

12    limitation in that the distinction as from no

13    construction necessary versus after the cutting device or

14    wire enters the intermediate layer is an academic

15    difference.  We don't understand how a clear -- how and

16    why then a clear claim limitation would need to be

17    redrafted.

18          THE COURT:  Let me hear from the defendants,

19    please.

20          MR. VALAIK:  Your Honor, in the intermediate layer

21    is probably similar to intermediate layer here in that

22    there really isn't much of a dispute between plaintiff

23    and defendants.

24          THE COURT:  Well, let me ask you this.  I'm

25    looking at your proposed construction and I'm fast

1     forwarding in my mind a jury box with a jury in it, and
2     lawyers at the table, a trial taking place.  I'm worried
3     about "enters the intermediate layer."  When the wire
4     touches it has it entered it?  If half the wire is inside
5     the intermediate layer and half the wire is outside, has
6     it entered it.  I mean this looks like to me it's rife
7     with potential disputes and problems, and of course claim
8     construction is supposed to limit the number of problems,
9     not increase them.  And I'm looking at entering the
10    intermediate layer, when do you enter?  When have you
11    entered?  When are you in the process of entering but you
12    haven't completely entered yet?  This looks like a
13    Pandora's box to me.  So why is this helpful and why is
14    it necessary as opposed to simply taking the claim
15    language as it stands and saying that there's no
16    construction necessary.
17         MR. VALAIK:  For two reasons, Your Honor.  Again
18    looking at the prosecution here -- and this is from the
19    Applicant in the course of prosecution.  They said the
20    Patent Examiner stated one of ordinary skill in the art
21    upon reviewing Appellant's entire disclosure would not
22    come to the conclusion that the method claims limit
23    inducing the bias to the cutting member until after it
24    enters the adhesive layer.  And so Viking makes
25    abundantly clear biasing has to take place in the

1     intermediate layer after that wire has entered.  And yet

2     when you look at the entire disclosure here, the

3     sophisticated Patent Examiner did not come to that

4     conclusion based on the entire disclosure of that.  This

5     biasing step is limited to being in the intermediate

6     layer.

7          THE COURT:  So as half of the wire passes into the

8     intermediate layer and half of the wire is still outside

9     the intermediate layer that portion of the adhesive

10    that's been separated by that first half of the wire was

11    not biased; is that right?  Because all the wire is not

12    in the intermediate layer yet.

13         MR. VALAIK:  Well, our position I think would be,

14    Your Honor, that once the wire enters the intermediate

15    layer, any portion of the wire, then you've entered the

16    intermediate layer.

17         THE COURT:  I'm worried about how we define

18    enters.  And we don't have to define enters unless I

19    adopt your construction.  So give me some comfort that

20    I'm not creating a problem instead of solving a problem.

21         MR. VALAIK:  Well, the other part is if we look at

22    the specification in the 537 Patent -- and I don't have a

23    slide on this.  But we mentioned this in our papers, and

24    actually plaintiffs had a slide on this in their

25    presentation.  The specification also discloses at Column

1      3, lines 55 through 60, of biasing prior to entering the
2      intermediate layer.  And so, you know, there's a
3      disclosure where it's in the spec, Viking clearly says
4      that's not biasing for purposes of this claim.  But if
5      the Court is worried after the cutting device wire enters
6      the intermediate layer, you know, we -- we could amend
7      this to make clear any portion of the wire enters the
8      intermediate layer.  But we believe a construction here
9      is necessary to prevent some dispute down the road.
10     Because as the Court has seen, the prosecution was rife
11     with prior art; Sampica, Tajima, some of these other
12     references which talked about biasing prior to entering
13     the intermediate layer.  And the whole Patent Appeal
14     Board decision was based on that prior art is
15     distinguishable because the biasing had not taken place
16     in the intermediate layer.  So we think a construction is
17     preventing a potential claim construction dispute in the
18     form of Daubert or something else down the road.
19            But I understand Your Honor's concern.  We don't
20     want to confuse the jury.  And so if we put in there "any
21     portion of the wire enters the intermediate layer" and
22     that clears up that confusion, we believe we would be
23     assisting the jury so that they don't make the same
24     mistake the Examiner here was told he made based on what
25     Viking said.

1          THE COURT:  Well, just for the purpose of
2     thoroughly confusing everybody, if biasing is applying
3     force, how does the wire ever enter the intermediate
4     layer unless a force has already been applied to it to
5     get it in the intermediate layer?
6          MR. VALAIK:  That's true, Your Honor.  That's why
7     we believe biasing, simply the application of force, is
8     too broad a construction.  Because you can't move that
9     wire unless you apply a force.  Biasing has to mean more
10    than that.  And so I think it is confusing.
11         THE COURT:  Well, I'm not sure how -- and I'm not
12    trying to backtrack, but I'm not sure how applying a
13    force to the cutting device to hold it in a given
14    position that you proposed for biasing, I don't know how
15    that addresses that issue of whether the force is applied
16    to the wire to move it into the intermediate layer, as
17    opposed to moving it through the intermediate layer once
18    it's already there.
19         MR. VALAIK:  Well, I believe the rest of the claim
20    will take care of that in terms of -- if we go back to --
21    I mean the rest of the claim addresses the biasing, the
22    cutting device in the intermediate layer.  And so we
23    believe read in context why the application of force to
24    hold it in a given position -- and we could modify that,
25    Your Honor.  We could modify "to hold it in a given

46

```
1     position" to "maintain a certain position" so that we get
2     away from the hold it language if the hold it language is
3     somehow going to be understood as being stationary.  But
4     we then believe in context that makes sense.  Because
5     when you look at Claim 1 here, you also have the driving
6     and advancing which is the application of force as well.
7     And so we believe that additional "to hold it in a given
8     position" or we would offer "to maintain a certain
9     position" that really adds meaning to that biasing
10    limitation and adds clarity.  And it's pretty clear, too,
11    it's adjacent the electronic display.  So we think that
12    would clear it up.
13         Getting back to in the intermediate layer though,
14    Your Honor, I don't want to leave that fully.  Again, we
15    would agree if we could put in there, if a portion of the
16    wire -- after a portion of the wire enters the
17    intermediate layer would clear that up.
18         THE COURT:  Well, I mean looking at the claim
19    itself which you've got on the screen, the biasing step
20    occurs before the driving step.  And if you're talking
21    about the driving language of the claim addressing the
22    issue of the force moving the wire into the intermediate
23    area, aren't you effectively reordering the claim here?
24         MR. VALAIK:  And really, this is I think probably
25    better if plaintiff responds to that.  But I think
```

1      logically biasing has to take place in the intermediate
2      layer and driving the cutting device into the
3      intermediate layer by definition then would have to
4      precede any biasing.  You have to enter the intermediate
5      layer to bias.  And so this being the second limitation,
6      you know, I think lends itself to that very confusion the
7      Examiner had.  Which the Examiner citing prior art,
8      Sampica and others, where biasing was taking place prior
9      to entering the intermediate layer, that's reading these
10     limitations in sequential order here.  Certainly don't
11     know how plaintiff intends to present their case to the
12     jury, but I'm sure it's going to be driving first in the
13     intermediate layer.  And biasing can take place at any
14     point as you are cutting through.  As plaintiff's counsel
15     said, it's just once.  And so hypothetically, that could
16     occur at any point.
17            THE COURT:  Well, if you take the claim language
18     on its face and if you don't go behind what the Examiner
19     did and didn't understand but we have an adopted -- we
20     have an allowed claim here, we're fixing it, we're
21     aligning it, we're biasing, and then we're driving it
22     into the intermediate layer.  So on the face of the claim
23     the biasing limitation occurs before driving it into the
24     intermediate layer which tells me there can be biasing
25     outside of the intermediate layer.  But you want me to

1    adopt a construction that limits the biasing to occurring
2    within the intermediate layer.
3            MR. VALAIK:  Yes, Your Honor.
4            THE COURT:  So how do you reconcile those facts
5    for me?  I mean are you not asking me to reorder the
6    claim by giving the definition to this language that
7    you're asking?
8            MR. VALAIK:  Well, I think the plaintiff would
9    cite law that the steps in the method claim do not have
10   to proceed in sequential order.  We haven't had that
11   argument.  And we, quite frankly, haven't had the
12   discussion with plaintiff, you know, what is the order by
13   which these steps take place.  The prosecution history
14   was rife with this very dispute and it was resolved
15   because plaintiff made clear biasing cannot take place
16   prior to entering the intermediate layer.  They were the
17   ones then who by definition I think limited Claim 1 here
18   to that understanding, that interpretation, Your Honor.
19           THE COURT:  Okay.  Anything further?
20           MR. VALAIK:  No, Your Honor.
21           THE COURT:  Thank you.
22           Okay.  Let's go on to the coplanar terms.
23   Coplanar aligning a cutting device in a coplanar
24   relationship.  And quite honestly, Counsel, this is where
25   I anticipated most of your arguments would take place,

1      but we've done a good job working up to this point.
2      Plaintiffs are telling me coplanar means in the same
3      plane.  And defendants tell me that, but when we get to
4      coplanar relationship defendants tell me that's
5      indefinite.
6          Let me hear from plaintiff first, and then I'll
7      hear argument from defendants second.
8          MR. PETRSORIC:  Thank you, Your Honor.
9          With respect to coplanar and aligning in a
10     coplanar relationship, there's two primary disputes.  The
11     first one is whether the cutting device and the
12     intermediate layer may share more than one plane, and
13     that's that why we have "a plane."
14         And the second one is whether aligning in a
15     coplanar relationship is indefinite.  And particularly,
16     whether a person of skill in the art would understand
17     that two or three-dimensional objects can be described as
18     coplanar.
19         And I'm going to address these two disputes
20     together because they are related.  Now again, we start
21     with the language of the claims.  And here first with
22     respect to biasing, the biasing step does occur after the
23     driving step so they didn't ask for a limitation that
24     required the method steps to be performed in the same
25     order.  And if they would have, we would have disputed

1    that.  So there's no limitation here requiring the method

2    steps to be performed in this specific order and there's

3    no dispute about that as far as we understand.

4            THE COURT:  Okay.

5            MR. PETRSORIC:  And so what does it mean to align

6    in a coplanar relationship.  First as I said before, we

7    fix the display unit in a carriage.  We expose the

8    intermediate layer on all sides.  The very next step says

9    you align a cutting device in a coplanar relationship

10   with the intermediate layer.  And Figure 7 which is

11   annotated with a Z, is shown on the slide.  We submit

12   that just based on Figure 7 and reading the claim

13   language one would understand with reasonable certainty

14   what it means to align a wire in a coplanar relationship

15   with the layer.  And the specification does more than

16   just give Figure 7, it gives example after example of

17   what it means to be coplanar and what it means to be in a

18   coplanar relationship.  And I'm going to go on to the

19   specific descriptions in the specification.

20           THE COURT:  Well, how do you respond to what I

21   assume I'm going to hear from the other side that even a

22   judge without an engineering degree, took ninth grade

23   geometry, and in ninth geometry coplanar was between two-

24   dimensional objects, not three-dimensional objects.

25           MR. PETRSORIC:  Well, I believe in geometry,

1     perpendicular and parallel are also between two-

2     dimensional objects and not three-dimensional objects.

3     So often those of skill in the art of mechanical

4     engineering understands that these descriptions -- and

5     it's not just coplanar, it's coplanar relationship.  So

6     it doesn't say the two- or three-dimensional objects are

7     coplanar, it describes them having a coplanar

8     relationship.  And when looked at in light of the

9     specification, one skilled in the relevant art which

10    would not be a geometry professor, at least that's our

11    understanding, would understand what it means and it says

12    so right in the patent, and explains it.  Column 1, 53 to

13    59.  This is right -- when it's the summary of the

14    invention, the second or third sentence, it says first

15    you hold it in a carrier, the phone or the device.  Then

16    it says a wire having a thickness of less or equal to

17    that of the intermediate layer is coplanar would set into

18    the intermediate layer.  So the wire being a thickness of

19    less than or equal to that of the intermediate layer is

20    the key to having that coplanar relationship.  Because

21    once you expose the intermediate layer on all sides, if

22    the wire is the same you can -- there's one available

23    plane, and you can just push it into that one available

24    plane.  But if the wire is thinner -- and the

25    specification explains that -- then there will be

1 multiple available planes in the intermediate layer that

2 you could use to push the wire through.  So that's what's

3 explained here at Column 1, 53 to 59.  But again, Column

4 6, 4 through 9, by interposing a wire or a cutting blade

5 of thickness equal to or less than that of layer 24.  And

6 as we saw in Figure 7, layer 24 is the intermediate

7 layer.  And the reason that's important again is because

8 in order to align a wire with the planes of the

9 intermediate layer it has to be the same size or less.

10 If it's thicker, you can't do it.

11    And now with respect to coplanar relationship.  As

12 shown in Figure 5, and as will be explained herein, the

13 use of a thin wire interposed between layers 22 and 26,

14 which is the top layer and the bottom layer, and aligned

15 in a coplanar relationship with the intermediate layer.

16 So we have a thin wire.  And thin really is the aspect of

17 where they are taking the geometric definition and using

18 it.  Since the wire is so thin, technically as matter of

19 geometry and we all agree the wire will have a --

20 technically a top plane and a bottom plane.  And we would

21 agree that each of those technical geometry planes has to

22 be lined up with the intermediate layer.  But the

23 specification uses the term and the claim uses coplanar

24 relationship as if the wire was so thin it would be

25 considered to have a one plane.  And that's how it's

1    described.  And this is describing it.  It says
2    preferably you align it as close as possible to the plane
3    adjacent the electronic display portion which is away
4    from the glass.
5         And then specification teaches again at 6, 10
6    through 18, preferred method.  You maintain the cutting
7    element in a coplanar relationship with the plane
8    adjacent the electronic display.  This can be
9    accomplished by aligning it carefully to maintain the
10   coplanar relationship.  So you're aligning it and you're
11   pushing and you're trying to hold it aligned with that
12   intermediate layer.
13        Then it goes on, it says the method can be
14   practiced by aligning the wire in the same plane as the
15   intermediate layer or in any plane between the two
16   interface planes.  The interface planes are the top and
17   bottom layers.  Now the defendants latch on to this and
18   say, see the use of "or."  It's saying it could either
19   happen in the same plane, or between something different,
20   any plane between the two.  And they say this is
21   confusing, one skilled in the art doesn't really know
22   what this means.  But the very next sentence explains it.
23   Because the wire may be thinner than the layer, there
24   could be multiple available planes.  If they are
25   approximately the same size then there's one available

1    plane, the wire is thinner, one skilled in the art would

2    understand and you can put it in any plane.

3          And then Column 8, 65 to 67.  Again, here it's

4    saying it's preferably aligned with the intermediate

5    layer at its midpoint or adjacent to the electronic

6    display portion without engaging its surface.  So it's

7    saying there's multiple available planes to align it

8    with.  And that's why our construction has "a" and their

9    construction has "the."  In the same plane.  And our

10   construction has in a same plane.  Because when you're in

11   a coplanar relationship there could be more than one

12   planes available and that's all we were trying to make

13   clear there.

14         Now the defendants, the only evidence they rely on

15   is The Facts on File Geometry Handbook.  And this is what

16   it says for the definition of coplanar; "lying on a

17   common plane."  And then on the right we have the claim

18   line.  And the question is would someone understand with

19   reasonable certainty what it means to align a coplanar --

20   align a cutting device in a relationship such that they

21   are lying on a common plane such that it's lying on a

22   common plane with the intermediate layer.  And with

23   reasonable certainty looking at Figure 7, we believe a

24   person with skill in the art would know, and certainly

25   know with a level of reasonable certainty what's meant

1    there.

2         Now in order to arrive at their argument regarding

3    indefiniteness, defendants must disregard the claim

4    context because the claim talks about your -- it's

5    using -- it's not coplanar, it's coplanar relationship,

6    and it's aligning the wire in the coplanar relationship

7    with the intermediate layer which is fixed.  To ignore

8    the field of the invention, instead relying on geometry

9    textbooks instead of anything from one of skill in the

10   art.  They misapply and misuse the specification and say

11   one of skill in the art wouldn't understand what coplanar

12   means in light of the specification.  With the

13   specification itself, at least in our view, provides an

14   understanding with more than reasonable certainty what

15   the phrase means.

16        The defendants also disregard the geometric

17   phrases are often used in claims to describe real-world

18   relationships between three-dimensional objects such as

19   parallel and perpendicular.  Defendants have no evidence

20   from one of skill in the art, no opinion testimony.  And

21   the defendants also disregard the courts, both the fed,

22   circuit, and district courts who routinely recognize that

23   words like coplanar can be used to describe the

24   relationship between real-world objects.

25        And lastly, in the Whirlpool case this Court

1    recognized that expert declaration to demonstrate the

2    understanding of one of skill in the art is typically

3    necessary for a finding of indefiniteness.  And here, the

4    defendant's argument is based almost solely on attorney

5    argument, other than the geometry textbook which I

6    referenced earlier.

7         And just one last thing before I sit down.  I

8    wanted to point out on the biasing step, away from the

9    glass.  In the parties' briefing -- and this is from the

10   defendant's brief themselves -- we agreed that away from

11   the glass means in the Z direction.  So the force is not

12   applied as you're pushing it into, that's not in the Z

13   direction.  This is recognized on page nine of the

14   defendant's brief.  They said, "the parties further agree

15   that the claim biasing step requires that a force is

16   applied to the cutting device in the direction along the

17   Z axis."  So there was some confusion based on the

18   defendant's argument.  They said, well, you're biasing as

19   you're pushing in.  That's not the claim biasing.  The

20   claim biasing goes down, and you can only do that claim

21   biasing in the intermediate layer.  And it goes away --

22   away from the glass.  That's the direction it goes if

23   you're pushing down.  Why?  To get around those shards of

24   glass, and that's what's described in the spec.  And in

25   the parties briefing they agreed to that, but defendant's

1    just argued that, no, you could be biasing as you're

2    going in and that's why it requires construction and

3    that's why it's confusing.  The plain language of the

4    claim states that the biasing must occur away from the

5    glass.  If this Court would like to clarify that to the

6    extent the defendants intend to argue otherwise, we would

7    not object to that.  But away from the glass is certainly

8    correctional.

9         That's all, Your Honor.

10         THE COURT:  All right.  Let me hear from the

11    defendants.

12         MR. DEANE:  So, Your Honor, as we know, the

13    coplanar relationship term that's at issue here is part

14    of this aligning step.  And we believe here that

15    plaintiff is correct that there's two principle disputes.

16    And the defendant's construction of coplanar is the first

17    dispute, and then whether the term is indefinite is the

18    second dispute.  I'm going to address the first part

19    first here.

20         And what we believe is that the defendant's

21    construction of in the same plane is the proper

22    construction.  Plaintiff's construction of in a same

23    plane is inconsistent with basic geometry.  And as you

24    just heard them come up here and say, they actually now

25    have even expanded it more to mean it just has to share

1    more than one plane.  And we think that that's completely

2    inconsistent with the definition of coplanar as Your

3    Honor pointed out, we all learned in ninth or tenth grade

4    geometry.

5         So certainly under all constructions the term is

6    indefinite.  But when you look at claims construction,

7    their construction is now so broad that it absolutely is

8    indefinite and we'll show you why here in a minute.  I

9    think it may help to start at a high level.

10        Up here on the screen is U.S. Patent -- or U.S.

11   Application 2010/0199818 from the file history.  And this

12   is showing that in the art these generic cutting machines

13   were known.  As Your Honor alluded to earlier, this is

14   the cheese slicer.  You can manually have a wire pulled

15   through reels.  You can manually slide a block that's

16   bonded together to separate the layers of that block, and

17   it was used in various contexts.  But these rudimentary

18   machines are not what plaintiff claims to have invented.

19   The machine on the right is from the asserted patents.

20   And what the plaintiff claims to have invented is a

21   machine that precisely aligns the wire -- you saw them

22   pull up those specification passages that say that -- and

23   then biases the wire in a specific way in the

24   intermediate layer.

25        And we believe this is evident from the claims.

1       What's up here on the screen is Claim 1 from the 953

2       Patent, and it says a display unit in blue -- and that's

3       from Figure 7, shows the phone as the display unit --

4       defining an axis extending along said intermediate layer.

5       And that axis is the X or Y axis that's shown on the

6       screen in Figure 7.  These are where the cutting device

7       must be aligned in the aligning step to be coplanar.

8               And we can see that this axis -- we can see that

9       one of these axises is important because in the driving

10      step you drive the cutting device into the intermediate

11      layer relative to this display unit axis.  So this

12      geometry is important to the claim.  The coplanar

13      relationship is fundamental to the claim.  And so the

14      defendant is focused on what coplanar means.  And again

15      as Your Honor alluded to, coplanar means in the same

16      plane.  Points A, B, and C are coplanar.  Lines A/B and

17      C/D are coplanar.  These are simple concepts that we all

18      learned from ninth and tenth grade geometry.  And this is

19      a basic mathematical principle, Your Honor.  You can take

20      judicial notice of what coplanar means.  You don't need

21      expert testimony for somebody to come in here and tell

22      you that.

23              We also know what coplanar doesn't mean.  Point C

24      is not coplanar with points A and B.  Likewise, if we

25      have parallel planes those are not coplanar.  C and D and

1     A and B are not coplanar.  And importantly here, Your

2     Honor, intersecting planes are not coplanar.  Points C

3     and D and points A and B on these intersecting planes are

4     not coplanar.  And we don't think that any tenth grade

5     geometry student would come up here and tell you

6     otherwise.  But plaintiff's definition of sharing a same

7     plane, or as they alluded to up here, sharing one or more

8     planes, is so broad that they are going to come in here

9     and argue later that it captures these orientations.

10          So going back to the patent, Your Honor, here's

11    Figure 3.  And I've annotated it with the wire across the

12    machine and the X/Y axis shown on top here.  And if this

13    claim is definite, Your Honor, then this is the only

14    possible thing that coplanar can mean.  In the same plane

15    as the X and Y axis that defines the intermediate layer.

16    It's kept taut --

17          THE COURT:  What about the situation, Mr. Deane,

18    where opposing counsel argued that given a disparity

19    between the width of the wire and the width of the

20    intermediate area that there could be multiple planes all

21    parallel to each other, but within the larger

22    intermediate area than the single width of the wire?  Are

23    those all the same plane in your mind because they are

24    parallel to each other?

25          MR. DEANE:  No.  We disagree with that, Your

1        Honor.  It's shown on this slide, points in two parallel
2        planes are in fact by definition not coplanar.  And
3        that's the problem with plaintiff's claim, is they've
4        used three-dimensional language in a two-dimensional way
5        and they've meshed them together in a way that
6        is uncertain and subjective to somebody trying to read
7        the claims.
8              And so in the aligning step -- which again, Your
9        Honor, is a precise alignment that the plaintiffs here
10       have invented.  What they've done is not define any
11       reference point on the wire or any reference point in the
12       intermediate layer that is supposed to be coplanar with
13       each other.  Instead, they've just simply said put these
14       two objects together and therefore they must be coplanar.
15       And we think fundamentally what that is, is leaving the
16       word coplanar out of the claim.  What plaintiff's want
17       you to do is say that if you would align in any
18       relationship with the intermediate layer then you have
19       met the claim definition of aligning in a coplanar
20       relationship.  And we think that's exactly why a person
21       of skill in the art, or anybody knowing what the
22       definition of coplanar means, would know that without a
23       reference point you can't actually align precisely in
24       what layer of the intermediate layer the wire needs to be
25       aligned.  I'm sorry, you don't know what layer in the

1    intermediate layer this wire is supposed to be aligned
2    in.
3         THE COURT:  But aren't you asking me to take a
4    two-dimensional concept that relates to a three-
5    dimensional process and say the square peg won't fit in
6    the round hole, and therefore we win?  Because this is a
7    two-dimensional process, it can't be applied in the
8    three-dimensional context even if we have language like
9    coplanar relationship, as opposed to absolutely coplanar.
10        MR. DEANE:  No, Your Honor, I do not believe that
11   we're asking you to do this.  What the plaintiff is
12   asking you to do is to rewrite the claim to avoid that
13   exact problem.  What the plaintiff could have done is the
14   plaintiff could have provided you a reference point.  For
15   example, the plane that runs on the top of the wire.
16   They alluded that the wire has an upper boundary plane
17   and a lower boundary plane.  They could have said that
18   plane is coplanar with the plane defined by the plane
19   adjacent to the electronic display.  Those would be in a
20   coplanar relationship.  Likewise, they could have said a
21   midpoint of a wire is coplanar with a midpoint of a
22   intermediate layer, but they didn't do that.  Instead
23   through their claim drafting and their choice of the
24   words, they have made this claim virtually impossible to
25   figure out where this wire is supposed to be aligned.

1          And that exact subjectivity is what gives rise to the
2     indefiniteness problem, certainly, you know, under
3     defendant's definition, but most certainly now under
4     plaintiff's definition.  And that's where we -- you know,
5     we don't think that plaintiff's definition solves this
6     problem of two dimensional versus three dimensional.
7          And if I can show why -- you know, I have this
8     illustration that I think expands what we're talking
9     about here where I have taken Figure 7, rotated it, and
10    then just sort of blown it up so that the intermediate
11    layer is shown here.  And, you know, we think that if
12    Your Honor is going to find this term definite, this is
13    what it is.  It's a straight parallel wire in a parallel
14    plane with the X/Y axis that we were just talking about
15    in the claim, and that's the only thing it can possibly
16    be.  But the problem with plaintiff's definition -- and
17    if you look at what plaintiff says is they said we're not
18    even applying that geometric definition to these terms.
19    We're not applying what a -- how a professor would use
20    this term.  And they say that -- you know, they've
21    defined a -- somebody with a background in engineering,
22    but a person with a background in engineering would apply
23    this term in the same way that they learned it in ninth
24    or tenth grade.  What they are saying is that the
25    asserted patents have a special definition.  But they

1    haven't given this special definition, they've simply

2    changed the word "the" to the word "a".  From a legal

3    perspective, that now changes entirely what the term

4    means, and it removes it completely from what everybody

5    that took tenth grade geometry would understand.

6           And here's an example of this, Your Honor.  This

7    is now a slanted wire that's going through the

8    intermediate layer.  It's no longer parallel to that

9    critical X/Y axis.  It's no longer sitting in any

10   parallel plane.  But the language that the plaintiff came

11   up here and used was that the wire simply has to share

12   more than one plane with the intermediate layer.  Well,

13   now they are going to come up here and try to argue that

14   this maybe falls within their construction of the term.

15   And we think likewise, this one too shares more than one

16   plane with the intermediate layer.  This would be a

17   vertical wire going through.  And this one, Your Honor,

18   this is a wire that's bent as it's going through the

19   intermediate layer.  It's not even coplanar with itself,

20   but as we saw, it has intersecting planes and those

21   planes could share more than one plane with the

22   intermediate layer.  And we think that by departing from

23   the geometric definition of this term they've now

24   rendered their claim even more indefinite.  Now a person

25   of ordinary skill in the art that was stuck trying to

1      figure out where to align the wire in a parallel
2      relationship with the upper and lower bounds of the
3      intermediate layer, are now stuck trying to figure out
4      how to actually orient the wire in the intermediate
5      layer.  And that from our perspective, Your Honor, you
6      know, renders the claim indefinite because it provides no
7      reasonable certainty to anyone trying to accomplish the
8      aligning step using this coplanar relationship.  And
9      that's a function of how the plaintiff drafted their
10     claim term.  They didn't have to draft it that way.  They
11     didn't have to ask Your Honor to rewrite it.  They could
12     have done it right the first time.  But instead, what
13     they need you to do now is they need you to come in and
14     essentially write out the word coplanar to save the
15     definiteness of their terms and we think that that's
16     improper under the legal standard.  We don't think that
17     aligning a cutting device in any relationship with the
18     intermediate layer is the proper way to construe this
19     term to save it from being indefinite.
20             And I'll address the cases that were cited for the
21     first time in plaintiff's reply brief.  And the only case
22     that they cited which actually tried to construe the term
23     coplanar, that was the Graco Childrens Product case.
24     They construed the term coplanar exactly as the
25     defendants ask you to construe it here.  They interpreted

1      it as in the same plane.  Didn't say in a same plane
2      because while those geometric handbooks may have said in
3      a plane, in the legal sense a plane means one or more
4      planes.  And that's exactly what they came up here and
5      asked you to do, was rewrite their claim so that it means
6      something that it doesn't mean.  And that's precisely why
7      the Court here said in the same plane.  Likewise, the
8      federal circuit here, they had no trouble using the word
9      coplanar not to -- not in a construction, not in the
10     context of indefiniteness, but to describe a flat panel
11     36.  Here they are using 2D language, flat panel, and
12     they are saying that the flange 40 that was bent out of
13     the plane of the flat panel was not coplanar with the
14     otherwise flat panel.  That's completely consistent with
15     how defendants are using the term.  And we don't think
16     that there's any inconsistency there with using two-
17     dimensional language and using the term coplanar in that
18     context.
19          In the other case that they cite here was a case
20     against Trinity Industries, and this was a guardrail
21     head.  And the Court here -- again not construing the
22     term coplanar -- said Edge 70C is in a coplanar
23     relationship with Edge 72D.  There's no inconsistency
24     here.  The Court there was using two-dimensional language
25     and said in that context that those two things were

1    coplanar.  And so again, it's not that you can never use

2    a term like parallel, or perpendicular, or coplanar, it's

3    that you have to set your claim up so that a person of

4    ordinary skill in the art would understand what reference

5    points you're using to then define those dimensions.  And

6    we think that fundamentally is the problem with the way

7    that they wrote their claim and why this particular claim

8    is indefinite.

9         THE COURT:  Let me ask you this, Mr. Deane, and

10   let's focus on coplanar, not coplanar relationship, where

11   we have plaintiff's proposed "in a same plane" and your

12   proposed "in the same plane."

13        I agree with you that -- and I don't know where on

14   your slide that the picture is, but back where you had

15   the bent wire and the different angles of the wire going

16   through the intermediate layer.

17        Yeah, back it up before that.  There you go.

18   Leave it on that one.

19        I understand that that's objectionable and

20   probably not intended, and I accept that as a fairly

21   valid argument.  Here's the problem.  As long as that

22   wire has a smaller size than that intermediate layer,

23   then there are multiple parallel planes within the

24   intermediate layer where that wire could pass through and

25   be not at an angle, but be at a same parallel plane with

1          the bottom of the glass or the top of the electronic

2          display.  And so you're telling me that their definition

3          opens the door to this, they are telling me that your

4          definition precludes any plane that's parallel to the

5          bottom of the glass or the top of the electronic display

6          because there are multiple planes and you say it must be

7          the same plane.  So how do you -- how do you suggest to

8          the Court that I rectify that?  Because I think their

9          point is valid, that if the wire is smaller than the size

10         of the intermediate layer then whether it comes in a

11         third of the way down the intermediate layer from the

12         top, or halfway down, or a third from the bottom, it's

13         coming in at a parallel coplanar direction.  And I don't

14         think there's a problem with that.  I think there is a

15         problem with what you're afraid of here.  So between "a

16         same plane" and "the same plane," how do you suggest that

17         I preclude them from being handcuffed by what they are

18         afraid of, and also protect you from being handcuffed

19         from what you're afraid of?

20              MR. DEANE:  Well, I think, Your Honor, if you

21         adopted our definition of in the same plane you could

22         still find the term indefinite -- or I'm sorry, find the

23         term definite.  I think that our definition --

24              THE COURT:  Well, you haven't argued coplanar is

25         indefinite.  You've argued aligning in a coplanar

1    relationship is indefinite.  But your indefinite argument

2    doesn't apply to the term coplanar by itself.  Not as I

3    read the briefing.

4         MR. DEANE:  That's correct, Your Honor.  And I

5    guess -- I guess our -- our point would be that if you're

6    going to find the term definite that -- that you are

7    correct that this is the way that it's supposed to be.

8    It's supposed to be this parallel or this straight, taut

9    wire aligned in the plane in the intermediate layer that

10   is consistent with that X/Y axis.

11        THE COURT:  So if the length of that intermediate

12   layer is 150 miles, the wire doesn't move up or down, it

13   rides through that intermediate layer at the same

14   relationship to the glass and the electronic device if it

15   is in fact coplanar.

16        MR. DEANE:  I think setting aside the biasing step

17   and sort of what you heard with the argument about the Z

18   axis, you're focusing on the aligning step.

19        THE COURT:  Right.

20        MR. DEANE:  Yes.  The plane that is 150 miles wide

21   and infinite in all directions here would be in the same

22   plane as the intermediate layer.  And in this particular

23   example, adjacent to the electronic display consistent

24   with the X/Y axis.

25        THE COURT:  And do you agree that in this drawing

1    with the intermediate layer certainly larger than the
2    size of the wire -- and again, I'm talking about the
3    distance from the top of the intermediate layer to the
4    bottom of the intermediate layer versus the top edge of
5    the wire to the bottom edge of the wire, assuming there's
6    a clear disparity between those two things such that the
7    height or the distance from top to bottom of the
8    intermediate layer is considerably larger than the same
9    dimension of the wire, that as long as it enters that
10   intermediate layer in a coplanar fashion -- or let me say
11   it another way.  As long as it is aligned to enter that
12   intermediate layer in a coplanar parallel fashion, that
13   that is not what you're complaining about and defendants
14   are all right with that, then that's one thing.  But if
15   you're telling me when we get down the road and you're
16   going to say because it doesn't specify the same plane,
17   it doesn't specify where on the height of that
18   intermediate layer it's going to come in, therefore it's
19   not properly aligned, therefore we win, game over, that's
20   something I need to know about now.  Because it sounds
21   like to me your point that it can't be at an angle or
22   something other than parallel with the plane is correct,
23   but that's not the same thing as saying it can only enter
24   the intermediate layer at this one point and it's
25   precluded from entering or being aligned to enter the

1          intermediate layer at any parallel plane within the

2          distance between the top of the intermediate layer and

3          the bottom of the intermediate layer.  Is that clear?

4                    MR. DEANE:  Understood, Your Honor.  And, yes, and

5          I can address that.

6                    So as part of our indefiniteness argument here at

7          Markman, that is our argument.  Our argument is that

8          because we don't know where it's supposed to be aligned,

9          whether at the top, the midpoint, or the bottom, based

10         off the words coplanar relationship, and because of

11         plaintiff's choice to use two, three-dimensional objects

12         and say they should be aligned in a coplanar

13         relationship, that that is precisely what renders the

14         term indefinite.

15                   Now if Your Honor decides that we are incorrect

16         and that that -- the term is not indefinite, then we

17         believe that our construction is this -- in the same

18         plane is this parallel construction that you see on the

19         screen, where again if -- if we're operating under Your

20         Honor's ruling that the term is definite and that a

21         person of ordinary skill in the art would know with

22         reasonable certainty what plane it's supposed to be

23         aligned in, then we would come in and say that the

24         parallel to those parallel planes like a deck of cards

25         almost, any one of those planes as long as the wire is

```
 1          parallel would mean in the same plane relationship.
 2                  THE COURT:  Okay.  You've answered my question.
 3                  What else do you have for me on this?
 4                  MR. DEANE:  Nothing else, Your Honor.
 5                  THE COURT:  All right.  Then I've heard argument
 6          on all the terms.  I'm happy to hear further argument but
 7          I don't really think it's necessary unless somebody feels
 8          there's something very pressing that we've overlooked
 9          somehow.
10                  Plaintiff's counsel, you look like you want to
11          stand up and say something.  Are you satisfied with the
12          argument or do you think there's something that has been
13          overlooked?
14                  MR. PETRSORIC:  I was just going to add one thing,
15          Your Honor.  We're okay with the parallel.  We used "a
16          plane" because it's both the top plane and the bottom
17          plane of the wire and the coplanar relationship.  So just
18          to make clear, we weren't trying to argue, you know, the
19          sideways and I think that's an easy way to solve the
20          problem on that.  It's the top plane and the bottom
21          plane.
22                  THE COURT:  All right.  Thank you.
23                  All right.  Then I'll consider that I've heard
24          adequate and competing argument on the disputed terms for
25          claim construction.
```

1          And with that, Counsel, I want to transition.  I
2     will do my best -- these matters are under submission.
3     I'll do my best to get you a claim construction opinion
4     as soon as possible.  But these disputes are under
5     submission.
6          I want to transition to what I had also noticed
7     you for today, which is a status conference on pending
8     motion, and motions to transfer or dismiss.  And quite
9     honestly, I did this because the Court was confused about
10    the briefing and the argument.  And I now think perhaps
11    there's been some -- perhaps unintentionally, but there's
12    been some light directed towards this problem that
13    perhaps explains how we got to where we got to.
14         Part of why I asked you, Mr. Pinker, about case
15    357 and Assurant is after the cases were consolidated you
16    amended your complaint to add Assurant but you filed it
17    in the lead case.  You didn't file it in the 359 case.
18    And the clerk's office has added Assurant to the 357 case
19    and does not have Assurant in the 359 case.  Now maybe
20    that wasn't your intention, but the post consolidation
21    amendment to add Assurant seems to have put it in a case
22    that's not necessarily where you intended it to go.  And
23    consequently, in reading the briefing on the transfer
24    issues, it looked like to me you were arguing I should
25    take a part of the case and send it to Sherman and keep

1     the rest of the case in Marshall.  And if you've got some
2     additional clarification on this, let me know.
3              But what we've got is we've got the three cases
4     that are consolidated.  We've got a Motion to Transfer
5     which seems to say I will conditionally concede propriety
6     of venue if you transfer on a convenience basis, but
7     that's only as to some defendants.  We have other
8     defendants who haven't moved.  We have defendants who
9     haven't taken a position.  We have an allegation of
10    convenience analysis that should take place, and we don't
11    have convenience facts as to some defendants.  Quite
12    honestly, I'm not sure how is best to proceed with this
13    venue issue that's been raised.  And perhaps some of it
14    is derived from the fact that your amendment may have
15    unintentionally placed this added defendant in the wrong
16    case because of the consolidation.  I don't know.  But I
17    wanted to have a discussion of exactly what you're asking
18    for and why you're asking for it so I have a better idea
19    how to understand and approach the motions that are
20    pending.  Can you address these comments and add
21    anything?
22              MR. PINKER:  May I approach?
23              THE COURT:  Please.
24              MR. PINKER:  I will obviously try, Your Honor, and
25    I apologize for the confusion.  The complaint was

1   obviously amended by the plaintiff.
2           THE COURT:  Right.
3           MR. PINKER:  And that complaint as I understood it
4   added I believe one defendant to the 359 case and removed
5   the Reconext defendant from the 359 case.  I filed a
6   Motion to Transfer, and in the alternative Motion to
7   Dismiss solely in connection with the 359 case.  We
8   filed it with the consolidated heading required by the
9   Court's order to file everything in a consolidated
10  fashion.  And if that resulted in confusion, I very much
11  apologize for that.
12          THE COURT:  Well, you're exactly right.  It's the
13  plaintiffs that amended the complaint, I didn't mean to
14  indicate otherwise.  But somehow, some way, the clerk's
15  office at least from my reading of the docket is now
16  showing the defendant Assurant in the 357 case and not in
17  the 359 case.
18          MR. PINKER:  The defendant Assurant is in the 357
19  case, Your Honor.  I represent in the 359 case the
20  following six defendants who are all of the defendants in
21  the 359 case.  Defendants Clover Technology Group, Clover
22  Wireless, Valu Tech Outsourcing, Teleplan Holdings,
23  Teleplan Services, and Teleplan Services of Texas.  Those
24  six defendants are to my understanding, the six
25  defendants named in the First Amended Complaint of the

```
 1    359 case.
 2          THE COURT:  Well, and I've discussed Assurant and
 3    perhaps I named the wrong defendant.  Valu Tech is
 4    being -- Valu Tech, Teleplan is listed as a defendant in
 5    the 357 case, not in the 359 case.  And the First Amended
 6    Complaint for Patent Infringement Document Number 24
 7    filed in the 357 case shows as the heading of -- or the
 8    style of that amendment Viking Technologies vs. Clover
 9    Technologies, Clover Wireless, Outsourcing, Teleplan
10    Holding, Teleplan Service Logistics, and Teleplan
11    Services Texas, Inc.  Valu Tech is not shown in the style
12    of the First Amended Complaint regarding the 359 case,
13    and this First Amended Complaint is filed in the lead
14    case, the 357 case.
15          Maybe plaintiff can add some clarification to
16    this.  And while you're going to the podium, why don't
17    you explain to me at a little bit of a higher level why
18    in light of Section 299 of the AIA, we've got multiple
19    defendants in a patent infringement case when each one
20    has got a right to a separate jury trial?  Did you expect
21    me to sever all of these sua sponte, or why are they all
22    lumped into one case?
23          MR. DEVINCENZO:  They are all related.  The 357,
24    358 and 359 were all filed in related because each of
25    those cases involves related entities, and we understood
```

1       that there were acts of infringement that would have cut

2       across multiple corporate entities within the families.

3               THE COURT:  Well, when you amended in Document 24,

4       what was your intention with regard to Valu Tech?  Was it

5       to go into the 357 case which is the case number listed

6       on your amended complaint, or was it to go into the 359

7       case?  And if it was to go into the case with Clover, et

8       cetera, which is the 359 case, and why was it named in

9       the style of the amendment so that that would be clear?

10      That's where the confusion is coming from.

11              MR. DEVINCENZO:  I understand, Your Honor, and

12      without full clarification I would assume that that's at

13      least at the very least a clerical error on our part and

14      we likely filed the amended complaint for the -- what

15      I'll call the Clover entities which includes Valu Tech

16      and who were originally named in the 359 case, the

17      amended complaint was likely filed in the 357 case,

18      thereby creating this confusion.

19              So what I would believe, that we would be able to

20      clean this up and make sure we style each of the cases

21      correctly as separated.

22              THE COURT:  Okay.  So from what I'm hearing, Valu

23      Tech should be in the 359 case and not in the 357 case.

24              And let me ask you this, Mr. Pinker.  In light of

25      that, is your motion regarding venue only limited to the

1  359 case or do you purport that it should apply to either

2  the 357 or 358 case?

3       MR. PINKER:  It is only limited to the 359 case,

4  Your Honor.

5       THE COURT:  Okay.

6       MR. DEVINCENZO:  Was there a question pending for

7  me, Your Honor?

8       THE COURT:  Well, clearly there was some confusion

9  as to the state of the docket and what the briefing on

10  the motion was apparently trying to ask for and I

11  couldn't reconcile in my mind how the briefing was asking

12  for that relief if the alignment of the parties on the

13  docket was correct.  And so that's really what prompted

14  this status conference being noticed today.

15       MR. DEVINCENZO:  Understood.  And so we will make

16  sure we clean up any of the clerical snafus then with

17  respect to the alignment of the parties within the -- at

18  least within 359 versus the 357, and we'll doublecheck if

19  there's any other issues there as well.

20       THE COURT:  Well, it sounds like from this

21  exchange that both plaintiff and defendants are all on

22  the same page, that this may be misaligned through an

23  unintentional clerical error more than anything else.

24       MR. DEVINCENZO:  Yes, Your Honor.  And I apologize

25  to the Court for that.

1          THE COURT:  Okay.  So plaintiff intends Valu Tech
2     to be in the 359 case represented by Mr. Pinker's firm,
3     and not the 357 case.  And that's Mr. Pinker's
4     understanding as well, that his firm represents all of
5     the defendants in the 359 case but none of the other
6     parties, correct?
7          MR. DEVINCENZO:  That is correct, Your Honor.
8          MR. PINKER:  That is correct from our perspective
9     as well, Your Honor.
10          THE COURT:  Okay.  Then I think in light of that
11     clarification I can go back to what's pending, but I
12     would suggest that action be taken to make sure the
13     docket reflects what the parties have just indicated they
14     believe the alignment of the parties should be.
15          MR. DEVINCENZO:  We will make sure it's amended,
16     Your Honor.
17          THE COURT:  Okay.  Thank you.  That helps.  That's
18     really all the clarification I needed.  I think I can now
19     go back to what's pending, in light of that clarification
20     and go forward with my analysis.
21          All right.  Is there anything else related to
22     either the status conference issue or related to the
23     claim construction disputes that I've heard argument on
24     that either party believes hasn't been somehow addressed
25     or raised and needs to be raised with the Court at this

1      time?

2           MR. EVERINGHAM:  Nothing from the plaintiff, Your

3      Honor.

4           MR. DEANE:  Nothing from us, Your Honor, as well.

5           THE COURT:  Okay.  Well, as I say, these claim

6      construction disputes are under advisement.  I'll do my

7      best to get you some written guidance by way of claim

8      construction opinion as soon as practical.  And I thank

9      you for your attendance and argument.

10          The Court stands in recess, the parties are

11     excused.

12                     (End of proceedings)

13

14

15

16

17

18

19

20

21

22

23

24

25

1   I certify that the foregoing is a correct transcript from the

2   record of proceedings in the above-entitled matter.

3

4   /s/ Lori Barnett                    8/2/21
    COURT REPORTER                      DATE

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25